# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| THOMAS J. CONWAY, IV | : CIVIL ACTION |
|---|---|
| v. | : NO. 18-4916 |
| U.S. BANK, NATIONAL ASSOCIATION, *et al.* | : |

## MEMORANDUM

**KEARNEY, J.**                                                                                   **May 29, 2019**

A borrower who does not reinstate his mortgage loan until after months of payment defaults understandably followed by foreclosure and added fees runs the risk of lost credit and possible continuing obligations for the fees even if he pays back the loan principal. When he reinstates the loan by paying outstanding principal, interest and escrow but refuses to pay the fees, he cannot presume the fees are satisfied absent the lender's promise or representation which he justifiably relied on. He cannot assume paying the principal and interest to reinstate the loan terms (and avoid foreclosure) means the lender automatically waives fees. After reviewing the borrower's third attempt at pleading a complaint challenging the billing of approximately $10,000 in outstanding fees which he has not paid, the borrower fails to plead a statutory or contract basis under Pennsylvania law to impose liability upon the lender charging him for fees which remain unpaid and possibly affecting his credit report. As the borrower has failed three times to state a claim based on these facts, we enter the accompanying Order dismissing his case with prejudice.

I.  **Alleged facts.** [1]

On November 5, 2004, Thomas J. Conway IV borrowed $80,000 to purchase property in Philadelphia.[2] He signed a promissory note agreeing to repay the $80,000 plus interest, escrow and fees to Finance America, LLC and secured this repayment with a mortgage upon the property.[3]

Defendants assert, and Mr. Conway does not dispute, Mr. Conway stopped paying his note in September 2013. On November 15, 2013, U.S. Bank notified Mr. Conway it acquired his mortgage.[4] On February 24, 2014, Finance America's nominee assigned the mortgage to U.S. Bank and Ocwen became the loan servicer hired by U.S. Bank.[5]

On April 9, 2014, U.S. Bank filed a foreclosure action against Mr. Conway.[6] U.S. Bank charged several fees including late fees, property inspection fees, and title report fees.[7] Udren Law Firm represented U.S. Bank in the foreclosure.[8] In a separate action not involving Mr. Conway, Ocwen entered a consent judgment in February 2014 with Pennsylvania's Attorney General and the Consumer Finance Protection Bureau.[9]

On October 24, 2014, Mr. Conway received notice Defendants approved him for a loan modification.[10] For unknown reasons, Mr. Conway did not promptly move to close on the loan modification.

Almost a year later, on September 12, 2015, U.S. Bank and Ocwen asked the trial court for a default judgment in the foreclosure action.[11] The trial court granted U.S. Bank and Ocwen judgment on January 7, 2016 and Defendants listed the property for Sheriff's Sale.[12]

On April 25, 2016, the trial court continued the Sheriff's Sale until July 1, 2016.[13] On April 29, 2016, Mr. Conway paid $19,827.99 to reinstate the loan.[14] Mr. Conway admittedly did not pay the charged fees.[15] U.S. Bank and Ocwen agreed to vacate the foreclosure judgment and cancel the Sheriff's Sale.[16] The trial court closed the foreclosure action on October 13, 2016.[17] But no one

contacted the Philadelphia Sheriff's Department until December 3, 2016 to stop execution on the judgment.[18]

After vacating the judgment, U.S. Bank and Ocwen attempted to collect $10,737.54 from Mr. Conway for "Past Due Fees/Other Charges."[19] Mr. Conway alleges Defendants should have removed these fees following reinstatement of his loan.[20] He alleges the forgiveness of these fees is a "side effect" of reinstating his loan.[21]

On December 13, 2016, an unnamed entity denied Mr. Conway credit.[22] Upon reviewing his credit reports, he found Ocwen reported late mortgage payments from July 2013 to October 2016.[23] Mr. Conway disputed the negative credit information with the credit reporting agencies.[24]

On April 27, 2017, Ocwen entered a consent judgment with the Pennsylvania Attorney General's Office concerning licensure for loan servicing.[25] Mr. Conway does not allege he had a part in the consent judgment.

Following reinstatement, Mr. Conway timely paid his mortgage.[26] In June 2018, Ocwen reported to credit agencies Mr. Conway's unpaid principal balance, along with $10,737.54 in fees.[27]

## II.    Analysis.[28]

Mr. Conway originally sued U.S. Bank and Ocwen on October 12, 2018 in state court alleging Defendants violated various federal consumer protection statutes when they foreclosed on his property in 2014. Defendants removed the case and moved to dismiss his complaint. We dismissed Mr. Conway's initial complaint and Amended Complaint holding the statute of limitations barred some of his claims and he failed to adequately plead his other claims. We granted Mr. Conway leave for one last attempt to adequately plead federal claims under the Fair Debt

3

Collection Practices Act, the Real Estate Settlement Procedures Act, and the Fair Credit Reporting Act.

In his Second Amended Complaint, Mr. Conway abandons his federal claims and instead brings several Pennsylvania statutory and common law claims. He once again invokes other litigation and consent judgments involving Ocwen, U.S. Bank, and non-party law firm Udren to which Mr. Conway is not a party. As we explained in previous Memoranda, these actions do not affect Mr. Conway's claims challenging the 2014 foreclosure action.

We address each of Mr. Conway's claims in turn.

### A. Mr. Conway fails to state a claim under the Pennsylvania Loan Interest and Protection Law.

Mr. Conway alleges Defendants violated Pennsylvania's Loan Interest and Protection Law because although he paid $19,827.99 to reinstate his loan, Defendants continued to seek outstanding fees resulting in negative information on Mr. Conway's credit report. Mr. Conway essentially alleges Defendants failed to restore him "to the same position as if the default had not occurred" under Section 404 of the Loan Interest and Protection Law following his reinstatement payment. Defendants argue Mr. Conway fails to state a claim under the Loan Interest and Protection law.

Under the Loan Interest and Protection Law, the Pennsylvania General Assembly requires lenders follow certain procedures before foreclosing on a mortgage.[29] Before initiating a foreclosure action, a lender must give a borrower thirty-days written notice of its intent to foreclose.[30] Under Section 404, after issuing written notice, the lender must give the borrower an opportunity to cure default to prevent a foreclosure sale.[31] The Pennsylvania General Assembly provides four methods for cure:

4

(1) Pay or tender in the form of cash, cashier's check or certified check, all sums which would have been due at the time of payment or tender in the absence of default and the exercise of an acceleration clause, if any;

(2) Perform any other obligation which he would have been bound to perform in the absence of default or the exercise of an acceleration clause, if any;

(3) Pay or tender any reasonable fees allowed under section 406 and the reasonable costs of proceeding to foreclosure as specified in writing by the residential mortgage lender actually incurred to the date of payment.

(4) Pay any reasonable late penalty, if provided for in the security document.[32]

A method of cure under Section 404 "restores the residential mortgage debtor to the same position as if the default had not occurred."[33] Cure under Section 404 "eliminate[s] the legal impact" of the foreclosure judgment.[34] In *Burch*, Fannie Mae initiated a foreclosure action against a property, obtained a default judgment, and sold the property at a Sheriff's Sale.[35] The property owner filed bankruptcy and Fannie Mae signed a stipulation to set aside the Sheriff's Sale and reinstate the mortgage.[36] The owner then defaulted again and Fannie Mae listed the property for Sheriff's Sale under the earlier default judgment.

The court explained the stipulation constituted a cure under Section 404. Such cure restored "the residential mortgage debtor to the same position as if the default had not occurred."[37] The court interpreted Section 404(c) as "eliminat[ing] the legal impact" of the default judgment, and thus the court (1) ordered Fannie Mae mark the default judgment satisfied, and (2) enjoined Fannie Mae from using the default judgment to list the property for Sheriff's Sale.[38]

To support his claim Defendants failed to restore him "to the same position as if the default had not occurred," Mr. Conway alleges Defendants failed to apply his lump sum payment "to each outstanding monthly obligation retroactive to the date [Defendants] claimed it was effectively originally due, and [Defendants] failed to credit [Mr.] Conway's account for any alleged fees they

5

had originally stated was due as of October 13, 2016," resulting in "negative and inaccurate information furnished to the credit reporting agencies."[39]

Following his $19,827.99 reinstatement payment, the trial court vacated the foreclosure judgment on October 13, 2016 and Defendants canceled the Sheriff's Sale.[40] Under Section 404(c), Defendants placed Mr. Conway in the same position as if he had not defaulted by eliminating the legal impact of the default judgment.[41] We fail to see how Section 404 imposes a duty on Defendants to remove negative information from Mr. Conway's credit report following reinstatement of his mortgage. He fails to offer, and we cannot independently find, authority supporting his theory. Mr. Conway fails to state a claim under the Loan Interest and Protection Law. We dismiss his claim.

### B. We dismiss Mr. Conway's breach of contract claims.

Mr. Conway alleged Defendants violated provisions of his November 5, 2004 mortgage. He also alleges breach of contract based on violations of a Pennsylvania statute and a consent judgment to which Mr. Conway is not a party.

To state a claim for breach of contract under Pennsylvania law, Mr. Conway must allege facts showing: "(1) the existence of a contract, including its essential terms; (2) a breach of that contract; and (3) damages."[42]

We address each of Mr. Conway's breach of contract claims in turn.

#### 1. Mr. Conway fails to state a breach of contract claim for a violation of the Pennsylvania Loan Interest and Protection Law.

Mr. Conway alleges "[a] violation of the [Pennsylvania] Loan Interest and Protection Law is a breach of contract by the Defendants."[43] Defendants respond Mr. Conway fails to state a breach of contract claim. We agree with Defendants. We find, and Mr. Conway provides, no authority holding a violation of the Pennsylvania Loan Interest and Protection Law constitutes a breach of

6

contract. Even assuming we accept Mr. Conway's argument, as explained, he fails to show Defendants violated the Loan Interest and Protection Law. Assuming he argues Defendants agreed to remove negative credit information from his credit reports, he alleges no facts showing an agreement establishing an obligation. We dismiss this claim.

### 2. Mr. Conway fails to state a breach of contract claim alleging Ocwen violated an unrelated April 27, 2017 consent judgment.

Mr. Conway claims a breach of contract alleging Ocwen violated an April 27, 2017 consent judgment involving Ocwen. As we explained in our December 6, 2018 Memorandum, Mr. Conway had no part in the litigation or consent judgment.[44] This consent judgment cannot form the basis of his breach of contract action. We dismiss his breach of contract claim under the unrelated consent judgment.

### 3. Mr. Conway fails to state a breach of contract claim alleging Defendants violated Sections 7, 9, and 14 of Mr. Conway's mortgage.

Mr. Conway alleges Defendants breached three sections of his November 5, 2004 mortgage: Section 7 titled "Preservation, Maintenance and Protection of the Property; Inspections," Section 9 titled "Protection of Lender's Interest in the Property and Rights Under this Security Instrument," and Section 14 titled "Loan Charges":

> **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has release proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair

or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration. . . .

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section. . . .[45]

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.[46]

Mr. Conway alleges Defendants performed "inspection, valuation and preservation activity" and charged him fees under these two sections without his authorization.[47] He also alleges Defendants failed to reduce the fees they sought "to the permitted limits under the law."[48] But Defendants need not obtain Mr. Conway's authorization.

Mr. Conway does not dispute he failed to make his mortgage payments starting in September 2013. Defendants could do "whatever is reasonable or appropriate to protect" their interest in the property following default. He cites no authority mandating Defendants reduce fees. Assuming he alleges the Ocwen's unrelated consent judgments mandates fee reduction, he fails to show how the judgment from a case not involving Mr. Conway obligates Defendants reduce his fees. Mr. Conway's claim fails.

### 4. Mr. Conway fails to state a breach of contract claim alleging a violation of Section 19 of his mortgage.

Mr. Conway claims Defendants breached a separate provision of his mortgage. He cites Paragraph 19 but also claims Defendants deleted the provision. Paragraph 19 provides:

> **19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one of more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an

9

institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstatement shall not apply in the case of acceleration under Section 18.[49]

In the "Family Rider" section of the mortgage, the parties provide "Section 19 is deleted."[50]

It is unclear whether Mr. Conway argues Defendants violated a deleted provision of the mortgage. Assuming he does so, his claim fails because the parties intended Section 19 would not bind them. Mr. Conway may be attempting to argue because the parties removed Section 19, he need not pay "expenses incurred in enforcing this Security Instrument" to obtain reinstatement.

We fail to see how Mr. Conway states a claim for breach of contract. The parties' removal of a contractual provision does not create an affirmative obligation for Defendants. Even if it did, Defendants did not condition reinstatement on payment of fees. Defendants reinstated Mr. Conway's loan following his $19,827.99 reinstatement payment, the state court vacated the foreclosure judgment, and Defendants canceled the Sheriff's Sale. We dismiss this claim.

Mr. Conway fails to state a breach of contract claim against U.S. Bank and Ocwen.

### C. Mr. Conway fails to state a claim under the Pennsylvania Fair Credit Extension Uniformity Act.

Mr. Conway alleges Defendants violated Pennsylvania's Fair Credit Extension Uniformity Act by attempting to collect "Past Due Fees/Other Charges" totaling $10,737.54. He argues Defendants are not entitled to these fees because they reinstated his mortgage in April 2016 following his lump sum payment. Defendant argue Mr. Conway fails to state a claim.

With the Fair Credit Extension Uniformity Act, the Pennsylvania General Assembly prohibits "unfair methods of competition and unfair or deceptive acts or practices with regard to the collection of debts."[51] "[T]he [Fair Credit Extension Uniformity Act] does not provide individuals with the right to institute private causes of action for violations[.]"[52] A plaintiff rather

10

must seek relief for a violation of the Fair Credit Extension Act under Pennsylvania's Unfair Trade Practices and Consumer Protection Law.[53]

"To bring a private cause of action under the [Unfair Trade Practices law], a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."[54] The plaintiff must allege he "'suffer[ed] [an] ascertainable loss of money or property, real or personal, as a result' of defendant's actions."[55]

In *Benner*, the plaintiff alleged the defendant improperly charged him a property inspection fee after he defaulted on his mortgage.[56] But the plaintiff failed to allege he paid the fee. Judge Slomsky explained the unpaid fee, while an outstanding liability, did not constitute a "loss of money or property" necessary to state a claim.[57]

Mr. Conway alleges Defendants used "unfair or unconscionable means to collect or attempt to collect" the charged fees.[58] But he fails to state a claim because he fails to allege a loss. While alleging Defendants attempt to collect "Past Due Fees/Other Charges" totaling $10,737.54, he fails to allege he paid these fees. He thus fails to allege a "loss of money or property" necessary to state a claim. He also fails to allege justifiable reliance.[59] But his claim is fundamentally flawed because he does not show Defendants improperly sought to collect the fees. Mr. Conway argues because Defendants reinstated his loan, he does not owe the charged fees. Again, Mr. Conway fails to show why reinstatement necessitates more than vacation of the foreclosure judgment and cancelation of the Sheriff's Sale. Mr. Conway fails to state a claim.

We dismiss Mr. Conway's claim under the Fair Credit Extension Uniformity Act.

### D. Mr. Conway fails to state a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law.

Mr. Conway alleges Defendants violated Pennsylvania's Unfair Trade Practices and Consumer Protection law when they "knowingly misrepresent[ed]" he owed fees in the foreclosure

11

action.⁶⁰ He argues "[a] violation of the [Pennsylvania] Fair Credit Extension Uniformity Act is a violation of the [Pennsylvania] Unfair Trade Practices and Consumer Protection Law."⁶¹ Defendants argue Mr. Conway fails to state a claim, and the Unfair Trade Practice law nevertheless does not apply to non-Pennsylvania-headquartered businesses.⁶²

With its Unfair Trade Practices and Consumer Protection law, the Pennsylvania General Assembly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."⁶³ Mr. Conway argues he brings his claim under the "catch-all" provision of the Unfair Trade Practices law prohibiting "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."⁶⁴

To state a claim under the catch-all provision, Mr. Conway must allege: (1) "'a deceptive act,' meaning 'conduct that is likely to deceive a consumer acting reasonable under similar circumstances'; (2) 'justifiable reliance [based on] the defendants' misrepresentation or deceptive conduct'; and (3) an 'ascertainable loss' caused by this justifiable reliance."⁶⁵

Mr. Conway fails to allege deceptive conduct, or "justifiable reliance" on alleged deceptive conduct. And once again, while he alleges Defendants attempt to collect late fees from him, he does not allege he paid these fees. Thus, he fails to allege he suffered an "ascertainable loss of money or property" necessary to state a claim. He again argues because Defendants reinstated his mortgage following his April 2016 lump sum payment, they can no longer seek late fees from him. But such reinstatement acts only to vacate the foreclosure judgment and cancel the Sheriff's Sale. Mr. Conway fails to state a claim. We dismiss his claim under Pennsylvania's Unfair Trade Practices law.

12

### E. Mr. Conway fails to state a claim for abuse of process.

Mr. Conway claims abuse of process alleging Defendants initiated the April 9, 2014 foreclosure action "without probable cause," conducted the action "with malice," and "misused the court system to damage" him.[66] He essentially alleges abuse of process because Defendants' lawyers continued the foreclosure action after he applied for a loan modification and failed to immediately stop execution of a vacated judgment.[67]

As explained in our December 6, 2018 Memorandum, to state a claim for abuse of process under Pennsylvania law, Mr. Conway must allege Defendants "(1) used a legal process against [him], (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to [him]."[68] Abuse of process under Pennsylvania law is:

> the use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process. Thus, the gravamen of this tort is the perversion of legal process to benefit someone in achieving a purpose which is not an authorized goal of the procedure in question.[69]

"There is no cause of action for abuse of process if the claimant, even with bad intentions, merely carries out the process to its authorized conclusion."[70] A plausible abuse of process claim "usually pertains to situations involving 'extortion by means of attachment, execution or garnishment, and blackmail by means of arrest or criminal prosecution.'"[71]

Mr. Conway alleges while he defaulted on his mortgage resulting in the foreclosure action, Ocwen "created" the default through "failures to provide proper servicing under the contract."[72] But Mr. Conway does not dispute he failed to pay his mortgage beginning in September 2013, and he alleges no facts showing how Ocwen failed to properly service his loan. Mr. Conway alleges the Pennsylvania Supreme Court found non-party Udren Law Firm liable for charging excessive fees in a separate action not involving Mr. Conway. We fail to see how this unrelated litigation affects Mr. Conway's claim. While he alleges Defendants' non-party law firm (1) continued the

13

foreclosure action while Defendants reviewed his application for a loan modification and (2) failed to immediately stop execution of judgment after the state court vacated the judgment, we fail to see how such allegations state a claim for abuse of process against Defendants.

We dismiss Mr. Conway's abuse of process claim.

### III. Conclusion.

In an accompanying Order, we dismiss Mr. Conway's claims against U.S. Bank and Ocwen. In dismissing his Amended Complaint three months ago, we granted Mr. Conway leave to amend to adequately plead claims against U.S. Bank and Ocwen. He failed to do so. We dismiss Mr. Conway's Second Amended Complaint with prejudice.

---

[1] Many of the alleged facts remain unchanged from Mr. Conway's last two complaints at ECF Doc. Nos. 1 and 15.

[2] ECF Doc. No. 27 ¶¶ 4-5.

[3] *Id.* at ¶ 5.

[4] *Id.* at ¶ 17.

[5] *Id.* at ¶ 7.

[6] *Id.* at ¶ 12.

[7] *Id.* at ¶ 33.

[8] *Id.* at ¶ 26.

[9] *Id.* at ¶ 8.

[10] *Id.* at ¶ 12.

[11] *Id.* at ¶ 18.

[12] ECF Doc. No. 9, at p. 2.

[13] ECF Doc. No. 27 ¶ 21.

[14] *Id.* at ¶ 16. At other times in his Second Amended Complaint, Mr. Conway alleges a $19,167.62 reinstatement payment amount. *Id.* at ¶ 36. As the number is not relevant to the adequacy of his claims, we accept the $19,827.99 amount for purposes of this Motion to dismiss.

[15] *Id.* at ¶ 37.

[16] *Id.* at ¶ 16.

[17] *Id.* at ¶ 21.

[18] *Id.* at ¶ 31. In this paragraph, Mr. Conway alleges "December 3, 2014." But based on other sections of the Second Amended Complaint and earlier complaints, we believe the correct date is "December 3, 2016."

[19] *Id.* at ¶ 59.

[20] *Id.*

[21] *Id.* at ¶ 19 ("A side effect of reinstatement entails the forfeiture of all claims to fees or expenses which are not germane to remedying the prior alleged default, including but not limited to property expenses, legal fees and sheriff sale fees.")

[22] *Id.* at ¶ 23.

[23] *Id.*

[24] *Id.*

[25] *Id.* at ¶ 53.

[26] *Id.* at ¶ 21.

[27] *Id.*

[28] When considering a motion to dismiss "[w]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e]

note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[29] 41 P.S. § 401.

[30] *Id.* § 403(a).

[31] *Id.* § 404(a).

[32] *Id.* § 404(b).

[33] *Id.* § 404(c).

[34] *In re Burch*, 88 B.R. 686, 688 (Bankr. E.D. Pa. 1988).

[35] *Id.* at 689.

[36] *Id.*

[37] *Id.* at 694 (quoting 41 P.S. § 404(c)).

[38] *Id.*

[39] ECF Doc. No. 27 ¶ 46.

[40] *Id.* at ¶ 64.

[41] *In re Jones*, 91 B.R. 725, 727 (Bankr. W.D. Pa. 1988), *rev'd on other grounds*, 122 B.R. 246 (W.D. Pa. 1990) ("Such a cure restores the mortgage to a current status and puts the Debtor in the same position as if the default had not occurred. The effect of such a reinstatement requires the creditor to initiate a new foreclosure action if default occurs again.").

[42] *Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 588 (W.D. Pa. 2017), *aff'd*, 753 F. App'x 124 (3d Cir. 2018) (citing *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)).

[43] ECF Doc. No. 27 ¶ 50.

[44] ECF Doc. No. 9, at p. 4.

[45] ECF Doc. No. 33-2, at p. 78.

[46] *Id.* at p. 81.

⁴⁷ ECF Doc. No. 27 ¶ 60.

⁴⁸ *Id.* at ¶ 61.

⁴⁹ ECF Doc. No. 33-2, at p. 83.

⁵⁰ *Id.* at p. 88.

⁵¹ 73 Pa. C.S. § 2270.2.

⁵² *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 359 (E.D. Pa. 2013).

⁵³ *Id.*; *see also Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015), *abrogated on other grounds by Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019) ("The [Fair Credit Extension Act] therefore does not provide its own private cause of action; rather, it is enforced through the remedial provision of the [Unfair Trade Practices law].").

⁵⁴ *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004)).

⁵⁵ *Benner*, 917 F. Supp. 2d 338, 359-60 (E.D. Pa. 2013) (quoting 73 Pa. C.S. § 201-9.2 (remedial provision under the Unfair Trade Practices law providing a private cause of action)).

⁵⁶ *Id.*

⁵⁷ *Id.* at 360 ("[A]n actual loss of money or property must have occurred to state a cognizable [Unfair Trade Practices law] claim."); *see also Kaymark*, 783 F.3d at 180 (explaining a lien on a property inflated by the disputed foreclosure fees did not constitute "ascertainable loss of money or property").

⁵⁸ 73 Pa. C.S. § 2270.4(6).

⁵⁹ *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227 (3d Cir. 2008) (affirming dismissal of plaintiff's claim when he failed to allege facts showing defendant's "deception induced him to purchase [defendant]'s products or engage in any other detrimental activity").

⁶⁰ ECF Doc. No. 27 ¶ 83.

⁶¹ *Id.* at ¶ 82.

⁶² We disagree with Defendants' contention the Unfair Trade Practices law does not apply to non-Pennsylvania-headquartered businesses. Defendants cite *Danganan v. Guardian Protection Services* to support their argument. 179 A.3d 9 (Pa. 2018). In *Danganan*, the Pennsylvania Supreme Court held the Unfair Trade Practices law's "prescription against deceptive practices employed by Pennsylvania-based businesses may encompass misconduct that has occurred in

other jurisdictions." *Id.* at 16-17. It did not hold the law does not apply to non-Pennsylvania-headquartered businesses. But we do find Mr. Conway fails to state a claim under the Unfair Trade Practices law.

---

[63] 73 Pa. C.S. § 201-3.

[64] *Id.* § 201-2(4)(xxi).

[65] *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 418 (E.D. Pa. 2016).

[66] ECF Doc. No. 27 ¶¶ 92-96.

[67] *Id.* at ¶¶ 103-11.

[68] *Hvizdak v. Linn*, 190 A.3d 1213, 1228 (Pa. Super. Ct. 2018) (citing *Werner v. Plater-Zyberk*, 799 A.2d 776, 785 (Pa. Super. Ct. 2002)).

[69] *Id.* at 1228-29.

[70] *Douris v. Schweiker*, 229 F. Supp. 2d 391, 404 (E.D. Pa. 2002), *aff'd sub nom. Douris v. Rendell*, 100 F. App'x 126 (3d Cir. 2004) (quoting *Cameron v. Graphic Mgmt. Assocs., Inc.*, 817 F. Supp. 19, 21 (E.D. Pa. 1992)).

[71] *Woods Servs., Inc. v. Disability Advocates, Inc.*, 342 F. Supp. 3d 592, 606 (E.D. Pa. 2018) (quoting *Zappala v. Hub Foods, Inc.*, 683 F. Supp. 127, 129 (W.D. Pa. 1988)).

[72] ECF Doc. No. 27 ¶ 100.